Good morning, and may it please the Court, Jeffrey Conner on behalf of the appellant. Your Honor, I'm going to try to reserve about three minutes for rebuttal, but I'll keep my eye on the clock. Your Honor, I can count at least seven errors in this case. First, the District Court misapplied the law and did not hold Mr. Agavo to the correct burden of proof in establishing extraordinary circumstances for equitable tolling. The District Court did not hold Agavo to his burden of proving diligence through filing for equitable tolling. The District Court incorrectly applied the legal standard for assessing the statute of limitations on Ground 7. The District Court erroneously declined to consider Nevada v. Jackson in addressing Claim 1 on the merits. The District Court relied upon distinguishable case law on the scope of what the Supreme Court has clearly established with respect to the rights of confrontation. The District Court misapplied AEDPA by conducting a de novo review of the record and then merely conducting a de novo review of the record and then declaring that to be objectively unreasonable. And finally, the harmless error analysis in this case is in conflict with the merits analysis and actually proves the reasonableness of the Nevada Supreme Court's decision. I'm happy to – that's a lot to try to cover in 15 minutes, so if the Court has specific questions of where it would like me to start this morning, that would be great. Why don't you start at the beginning? Otherwise, I will start – The tolling issue. Start with the tolling issue. So, here, I think the most obvious thing for me with the tolling issue is that the petitioner has a burden of establishing extraordinary circumstances that warrant equitable tolling. Here, the District Court analogized this case to this Court's decision in Gibbs v. LeGrand. This case is nothing like Gibbs v. LeGrand. In Gibbs, counsel failed to communicate with his client for a period of years. There was a brief period of time where the counsel reconnected with the client after the client had filed a bar complaint, but otherwise, there was a period of years where counsel was not in contact with his client. He failed to inform his client that he had changed law firms, making it very difficult for his client to even find him. And then, it was the petitioner's own investigation and research that led him to discover that his state court proceedings had concluded. That is not what we have here. At best, what we have here is an email from the petitioner's sister to counsel, just shy of two months after the remediator issued from the Nevada Supreme Court's decision in the first state habeas appeal, that indicates that she was trying to retrieve the file to provide to another attorney. The only reason that she would be doing that is because she already knows that the state habeas proceeding has concluded. Is there any information, anything in the record that shows that his counsel alerted Agavo or his sister or whoever helped retain him prior to about two weeks or about a month before the one-year period ended? Is there anything up at that time where counsel sort of said, hey, here's the decision of the Nevada Supreme Court on your post habeas conviction appeal. Here it is. You lost. I'm not going to represent you anymore. I'm out of this. I've lost too much money. It's been too expensive. There's nothing in the record that establishes what happened between June 7th and August 1st. But it's not my burden to produce that evidence. I don't have to disprove his claim for equitable tolling. He has to prove that he was abandoned. No, I understand that. And they have not produced anything to establish when Agavo first learned that the state habeas proceeding was over. Judge Mahan blew right past that and found abandonment based on Gibbs. Well, I mean, the State could have gone out and contacted his lawyer and said, hey, didn't you send him a copy of the decision? I could have done that, but I don't have to do that. Well, you know, okay. Fine. You didn't have to do that. I pointed out the factual discrepancy in the record that Agavo produced, which should have required Judge Mahan to recognize that there was a factual dispute on the questions of extraordinary circumstances, and it should have been on the petitioner to come forward and say, I can address that, Your Honor. Here's either my evidence or here's a motion for an evidentiary hearing, and here's what we'd be able to present in an evidentiary hearing to prove abandonment. But they didn't do that. But the other side did actually offer evidence in the form of review of the file. Legal Aid, I guess, was representing him at that particular point, reviewed the file, saw that there was no indication that there was any representation to him about the fact that he had lost his petition. And, you know, as far as abandonment goes, I understand that you want to consider two years or three years, but really what is at stake here is the right to go forward with your issue, and that two- to three-month period is essentially crucial, because once that two- to three-month period's over with, the defendant has no access to federal court. So for that period of time, there seems to be no representation that counsel ever said anything to him or to his family, for that matter, until right before the deadline for the filing of the habeas. And why isn't that – I mean, why is that not abandonment? Two responses to your question, Your Honor. First, there's no representation – they haven't had a declaration from counsel that's devoid of anything about when he communicated this information to the family and or Mr. Agavo. That's a major deficiency to me in their argument for equitable tolling, that counsel could have said, well, I didn't provide them any information until this communication that happened on August 1st. I think the sister's email undermines that. We don't know when the communication actually happened, but the sister's email suggests that at least at some point before August 1st, the attorney had let them know. The second point is that – I mean, this kind of folds into the diligence inquiry for equitable tolling and this Court's requirement for diligence through filing, that the Petitioner has to show that he was diligent before, during, and after the existence of the extraordinary circumstance, that just because there's a small window of time remaining for him to file his federal habeas petition after the conclusion of state proceedings does not transform garden variety negligence into an extraordinary circumstance that amounts to abandonment. It cannot be that just because there's a short window of time for the Petitioner to act after the conclusion of the state habeas proceedings, that that somehow turns counsel's actions that would otherwise be garden variety negligence into abandonment that would satisfy the extraordinary circumstance necessary for equitable tolling. And do you think the fact that the attorney actually drafted a sample pro se petition but then sent it to the wrong place so that as a result more time elapsed before, in fact, Mr. Ragavo got noticed, do you think that contributes to, you know, basically abandonment? I don't think it contributes to abandonment, Your Honor. I think what it contributes to or what it establishes is garden variety negligence. It's no different than what the Supreme Court said is not an extraordinary circumstance in the Lawrence case, which is an attorney blowing a deadline accidentally. From what Ragavo's lawyer said, was Mr. Gallo, is that his name? Or Gallo, yeah. I mean, at some point he said, I've just lost too much money on this case. I'm not going to proceed with any federal proceedings. You know, I'm done. And that's manifested when he says I'll help prepare a pro se or send you the documents. I guess it was sending him the documents. So he could—so Ragavo could prepare the pro se. Unlike the Holland case from Holland v. Florida, Gallo didn't have any obligation to represent him in the federal proceedings. The attorney where the Supreme Court found the possibility— I thought the record evidence—I don't want to waste all your—not waste, but I don't want to spend all your time on this because I know you're going to want to read the other. But I just have one last comment on this, and that's that I thought there was a declaration or something in the record by somebody that he was retained to do both the state habeas and the federal habeas. The attorney's declaration about—and the retainer agreement did not provide for that. That would be an additional fee for him to even do the state habeas appeal before they even got to the federal. He agreed to do the state habeas appeal for a reduced fee. And whether Ragavo mistakenly believed that the attorney was going to represent him in federal court is not an extraordinary circumstance that's external to Mr. Gallo. That's Mr. Ragavo's own misunderstanding. I'm going to say on this, but it seems like at that point, if that's the situation, that Mr. Gallo, as soon as that opinion came down, should have said, here's the decision of the Nevada Supreme Court. You're on your own. Go. Go forward. I've thought about that, too, Your Honor, but that's not their argument. So— Why don't you consider the merits of some of these claims? Certainly, Your Honor. I think — I mean, the first and most obvious error with respect to the merits here is the district court's just flat refusal to consider Nevada v. Jackson at all because it wasn't clearly established at the time of the Nevada Supreme Court's decision. Jackson isn't a case clearly establishing federal law. It's the United States Supreme Court applying AEDPA to what the U.S. Supreme Court had already clearly established. And when you look at the district court's analysis in this case, it's very clear that part of what the district court is suggesting that Mr. Agavo wanted to use the California allegations for was to cross-examine Mom for the purpose of impeaching the daughter. That is exactly what Nevada v. Jackson is about, that you cannot impeach— the defendant, who was seeking to use the California charges, immediately said, well, I think we can bring the child back to answer the questions. So that was the immediate response. It was not necessarily just to impeach the mother. It also was to address some of the things that the child said in California which were inconsistent in a number of ways with things that she testified to in Nevada, including the nature of the assaults, et cetera. And I thought that was really what was one of the purposes of the petitioner here, that is to examine with this child the inconsistencies about when she reported, how many times she reported, and also the nature of the assault. What's, I think, troubling about the district court's order in response to your question, Your Honor, is that the district court doesn't do that analysis of peeling those layers apart to address the different ways that this evidence could have been presented to and considered by the jury. And I think that problem, the fact that the district court struggled with peeling these layers apart, is prime evidence of why lay jurors who don't understand how the rules of evidence work would have struggled to distinguish between how this evidence was being presented to them. And when you do look at the record, when the defense attorney was making the record, it was very clear that her intention here was to try to impeach mom, that she wanted to impeach the mother, not the victim. And the purpose of that was to try to undermine the victim's credibility. That is exactly what Nevada v. Jackson is about. So you think that when the trial judge brought up the fact that, well, we can bring the child back to testify, that was just on the trial judge's own without really assessing whether, in fact, the parties were asking for that or the petitioner was asking for that? The judge was the one that raised that. The defense attorney then subsequently said yes, and then the judge returned to her, wait a minute, I thought this stuff wasn't going to come in. And if you get to just the pure confrontation issue, you still have to deal with the Nevada's two things that we've raised in the briefing. One is just the mere fact that in Delaware v. Van Arsdale, the United States Supreme Court made very clear that you don't have a right to confrontation in cross-examination in whatever means or manner that you want, that courts can place limitations on cross-examination for the exact reasons that the Nevada Supreme Court identified in this case. The Nevada Supreme Court's analysis was a reasonable application of a well-established rule of evidence that the Supreme Court addressed in South Carolina v. Holmes. This struck me when I read the briefs and looked at some of the evidence. There was a pretty close case. First jury was hung, right? Yes. And it struck me that what happened in California was pretty significant. I think it's significant too, Your Honor, in the sense that if they presented that evidence and they couldn't prove that it was false, all it does is reinforce the state's case. And so that's why the Nevada Supreme Court's focus on— I thought it was kind of strange that after the daughter in California had reported this, brought this to her mom's attention, and then shortly, you know, and then they pick up and they move to Nevada into a trailer that's provided by the person that allegedly abused the daughter. All that seems kind of— But even if we—and I'm over time by 30 seconds already, so— Go ahead and answer the question. Even if we assume that this undermined mom's credibility, it doesn't undermine the victim. Otherwise, that turns into the Nevada v. Jackson issue for which the jury couldn't have considered that information. And there's other corroborating evidence that the daughter talked to about what happened. And they had a full opportunity to cross-examine the daughter and those witnesses and even present an expert on the issue of child suggestibility. All right. Okay, I'll give you some time for rebuttal. We'll hear from the— I believe. Good morning, Your Honors, and may it please the Court. I'll follow the same order as my colleague across the aisle. I'll try and address tolling briefly, and then I'd like to save the majority of my time to discuss the merits. The reason for tolling in this case and the reason why the district court correctly applied tolling is attorney abandonment. The post-conviction attorney unjustifiably delayed for three months giving Mr. Agavo notice that, number one, the state post-conviction appeal had ended adversely, number two, the attorney was not going to be handling the federal post-conviction proceedings, and therefore, number three, that the client needed to go into federal court on his own. That amounts to abandonment as this Court has defined it under the Gibbs decision. Now, I understand opposing counsel to be making three arguments primarily about tolling, so let me try and address those three in order. First, I hear an argument that the facts that we've alleged in this case are not equivalent to the facts in Gibbs. And in our view, that just misunderstands the facts of Gibbs. So in Gibbs, what you have is a state post-conviction decision that comes out in June of 2010, and then in October of 2010, the limitations period expires, and then the petitioner finds out about the loss in December of 2010. So the gap in time between the state post-conviction loss and the limitations period expiring is four months. Here we have a state post-conviction decision in May 2013. The limitations period expires in August 2013. And a little after, a couple weeks after that is when Mr. Argavo finds out that he needs to go into federal court and ends up filing that paperwork. So three months, four months, that's an equivalent timeline. And what Gibbs really focuses on throughout the opinion is if you're a petitioner and you have a reasonable expectation that the attorney is going to handle the federal proceedings, and if you don't know that the state proceedings are over, you're lulled into a sense of that you don't need to be doing anything. And if you don't know that the state proceedings are over, you don't know that you're going to be on your own in federal court, you have no reason to be working on your federal petition. And it's especially difficult for petitioners if they don't have a copy of the state appellate court decision and they don't have a copy of the file. And that logic applies directly to this case as well. So what do we do with the sisters' involvement? Right. So to back up, we submitted a plethora of evidence to the district court about this issue, including declarations, e-mails, and other documentation. The state is trying to say that we haven't proven our argument, and they're focusing on this e-mail from the sister. And the e-mail from the sister I do think is very telling because it's a lengthy e-mail. She's making repeated complaints about the lack of communication between the attorney and the family and Mr. Agavo. She's saying that she's left several messages and weeks have passed and they want a status update. He's not responding to their calls. He's complaining about the amount of money that she is complaining about, the amount of money that they have spent on this lawyer. And nowhere in that e-mail does she say anything at all that would suggest she's aware that they have lost their state post-conviction appeal. And you would think that if that's the reason that she's upset, she would have said so at some point in this lengthy e-mail. So there's nothing. What is the other plethora of evidence that you introduced? Sure. So we have five declarations. We have a declaration from Mr. Agavo himself, from the post-conviction lawyer, from two inmates who were helping Mr. Agavo, who is a Spanish speaker, were helping him get the federal petition ready, a declaration from our investigator who reviewed the entire state post-conviction lawyer's file. To actually prove that Mr. Agavo did not know about the ruling until late August, what evidence do you have? So we have the declaration from Mr. Agavo himself, where he says that prior to receiving the letter in August of 2013, the attorney had not informed me that my state appeal was over. We have a corroborating declaration from one of the inmates who says, as far as I know, Agavo had not received notice that his state appeal was over prior to the August 2013 letter with the federal petition. We have the declaration from our investigator who reviewed the entire state post-conviction file and found no notation whatsoever, no letters whatsoever, between the May 2013 decision and the August 2013 letter. But you have an affidavit from Agavo saying that he had no notice until August. I think that's inconsistent with what the state has said, but you got that introduced before the magistrate judge. Correct, yes. We had a declaration from the client, from the post-conviction lawyer, et cetera. And ultimately the question I have is, you know, what's this line between negligence? Because we have so many cases where the court has said, well, that's attorney negligence, and therefore no tolling and pure abandonment. So I'd appreciate if you could address that. But then also, in your view, is the abandonment sufficient up to the point where he finally notifies Agavo, or do you also need to rely on the fact that the materials were sent to the wrong address? So let me address both of those questions. First of all, as far as the line-drawing problem, I agree that sometimes there's line-drawing problems between negligence and abandonment. But Gibbs is clear that if a state post-conviction lawyer unjustifiably delays sending notice that the state post-conviction proceedings are over, they've ended adversely, it's time for the petitioner to move on, that that amounts to abandonment. That involves a four-month gap in time between the end of the state proceedings and the limitations period expiring in federal court. We've got a three-month gap here. Three months and four months are close enough that we fall under Gibbs. And then I apologize, Your Honor, I forgot the second part of your question, if you don't mind restating it. Well, the second one was really when we're considering, you know, where does the abandonment come in? When the attorney kind of slightly re-ups and sends this form petition but to the wrong address, how does that figure into the tolling and the abandonment issue, in your view? In my view, it adds insult to injury. The primary injury is waiting until August 2nd to send a letter in the first place, and that in and of itself is sufficient. The fact that he sent it to a wrong address, again, adds insult to injury and compounds the abandonment. So unless the court has any other questions on the tolling issue, I'd like to move on and address the merits of the confrontation claim. The trial court in this case completely prevented the defense from conducting any cross-examination whatsoever on the California allegations, which were crucial to the defense theory. That decision was an unreasonable application of clearly established U.S. Supreme Court precedent. And two previous Ninth Circuit decisions have come to similar outcomes in very analogous cases. The district court properly applied those two cases and reached the same outcome here. So let me begin by talking about those two cases, and then I'll move on and talk about the facts of this case more specifically. The two cases are Fowler v. Sacramento and Hawley v. Yarborough, and they are directly on point. Now, I'm sure the court is familiar with litigants coming in and saying such and such a case is directly on point. I'm sure sometimes that's more true, sometimes it's less true. Here, the similarities are truly uncanny. All three of these cases are criminal state trials for alleged child sex abuse offenses. In all three cases, the defense wanted to cross-examine witnesses about prior statements that the witnesses had made that would help the defense theory. In all three cases, the trial court completely precluded any cross-examination whatsoever on those topics. And in all three cases, you have state court decisions saying that that was justifiable based on trial management concerns. And what Fowler and Hawley say is that those state court decisions are unreasonable applications of clearly established U.S. Supreme Court precedent. There is a clearly established right under Supreme Court authority to cross-examine witnesses on topics that would expose the jury to facts that could cause them to draw adverse credibility determinations against the state's witnesses. Now, a trial court... I want to ask, since you're discussing Jackson, it distinguishes both Hawley and Fowler. And so where does that leave us after Jackson? That's correct. I mean, that's something we have to grapple with, and you as well. Correct. So Jackson is a case about the Sixth Amendment right to present a complete defense, which is separate from the confrontation right that we're talking about here and that Hawley and Fowler were discussing as well. So what Jackson says is there's no clearly established right to present extrinsic evidence on collateral issues under the right to present a complete defense.  And what they say is that Hawley and Fowler are two cases that apply the U.S. Supreme Court's clearly established law involving the right to confront witnesses and cross-examine them under the Confrontation Clause. They're cases involving a lack of full cross-examination. In Jackson, there was full cross-examination on the relevant topic. What the defense was complaining about was the inability to present extrinsic evidence in their case. And so Jackson cites Fowler and Hawley with approval, essentially. I mean, they're citing those two decisions. They're saying they're applying our clearly established jurisprudence on the Confrontation Clause. They're not right to present a complete defense case. That right is a completely separate right. And it would have been very easy for the Supreme Court in Jackson, if it disapproved of Fowler and Hawley, to have said something along the lines of, those cases were also improper applications of 2254D or something along those lines. The Supreme Court did not say that. So Jackson, in our view, is a clear indication that Fowler and Hawley are good law, and they are binding on this Court with this case. And I'll emphasize that I have not heard anything from opposing counsel even attempting to distinguish the legal principles or the facts of the cases involved in Fowler and Hawley. They are incredibly closely on point, and the District Court properly applied those cases and reached the same outcome. Well, go ahead. I was going to move on and just discuss the facts of this case a little more specifically and why the error was harmful in this case. I think the panel asked some questions that are in line with our theory, which is that there was cross-examination of the mother to impeach the mother, and there would have been cross-examination of the child as a recalled witness. One of the things I was confused about is that the trial judge kept talking about no motion was filed. And so I was thinking that perhaps all of the parties and the judge were actually considering this evidence from California as 404B evidence, which it's not. You're not offering it as 404B evidence. You're offering it as essentially related to impeachment. Is that correct? And was there a misunderstanding from the trial judge about what the nature of this evidence was? I agree with that characterization. I read the colloquy as the judge being concerned about the lack of a prior bad acts motion, the equivalent to a 404B, and I'm also confused by that. I think what was going on is there was essentially an agreement going into the first trial. The prosecution didn't want to get into the California allegations. The defense didn't want to get into it either, and therefore there was sort of a stipulation that nobody's going to be going into these California allegations. But at the second trial, that changed in part because the state changed the way it presented its case and opened the door. And so once the defense told the judge now it's intending to go into the California allegations, I think perhaps that caught the judge off guard and the judge expected the defense to stick with the original script. But, of course, as the defense emphasized repeatedly during the colloquy, there's no obligation to try the case exactly the same way both times. They made a calculation that based on how things went in the second trial, it was advantageous to the defense to present those California allegations. And they would have been incredibly helpful to the defense in impeaching both the mother as well as the child. And I'd like to focus on the mother, especially in light of the state's closing argument, which really took advantage of the exclusion of the California allegations, because what the state says during closing argument, and this starts at ER 2803, they say the mother has no motive to lie. She's not disgruntled. They say that she finds this picture, which, as a side note, is clear to any lay person. This is a child's drawing and not an adult drawing, much less someone like Mr. Agava, who's a very skilled artist. Anyway, she finds the drawing, is alarmed by the drawing, is willing to get help and stay at a shelter because, quote, unquote, she's so frightened and she believes her daughter so much. She gets someone from California to come to Las Vegas and bring them back the next day. She is, quote, unquote, very credible. Just what a mother would do, right? Quote, her behavior is consistent with a mother that believes her daughter. Her behavior makes her credible in this case. The mother, what she did, her actions demonstrate that she is credible in this case. That is improper vouching that Nevada Supreme Court agreed it was improper vouching, and the premise for the vouching would have completely gone away had the defense been able to impeach her based on the California allegations because her behavior shows that she is not credible, that she is not acting in a credible manner. But how would you use the California allegations to impeach the child? So I believe some of the court's questions were directed at that, and I agree with the idea that what's going on in California is very different from what's being alleged in Las Vegas. They're both two very serious sets of allegations, but the California allegations have very lurid details. I don't want to go into them, but suffice it to say you can look at the briefs. They are very lurid details, and the Las Vegas allegations, oddly enough, do not contain any sort of those same lurid details. Again, two very serious sets of allegations, but one has a wide range of details that are just not in existence in Las Vegas, and there are also inconsistencies with how the child reported the allegations in California. There are inconsistencies with how she reported them in Vegas. The California and Vegas allegations are inconsistencies, and given how close this case was, the initial hung jury, the Nevada Supreme Court saying that it came close to reversing, the state had a very weak case, and the California allegations would have prevented them from proving their case beyond a reasonable doubt. I see I'm over my time. Unless the court has any questions, I just ask you to affirm. Okay. Thank you very much, counsel. We'll have two minutes on for rebuttal. Thank you, Your Honor. Just to address two quickly, two questions from Judge Sessions. I'm sorry if it made it seem like I represented that Agavo hadn't made a statement that he didn't hear from his attorney that the proceeding was over. There is a declaration in the record that says that, but what he doesn't say is that he didn't know, and if you look at the sister's email, which is at 4ER 671 to 673, there's nothing about asking for a status update. She wanted the file back because they were hiring another attorney. They knew it was over. Your question about the confusion about the 404B, I agree that the record does reflect that the judge starts talking about prior bad acts. If you look back at the original discussion from the first trial, I think that might help with the clarification. I think what she was caught up with was she was actually referring to what in Nevada is called a Miller motion, which is the corollary to presenting prior bad acts. If a defendant wants to present prior false allegations of sexual abuse in a trial, they have to give the state pretrial notice of that in order to cross-examine the victim on that. That's Miller versus state, which I think is discussed in the briefing. And then just the last point I would make about Hawley and Fowler is that those cases are exactly what the U.S. Supreme Court has more recently said is not a proper application of AEDPA. They are essentially a de novo review of the record, which then puts a stamp on it that it was objectively unreasonable. That runs afoul of what the Supreme Court has said that a federal court is supposed to do when applying 2254D. That's exactly what Judge Mahan did in this case. If you look at his analysis, it is a straight up, I disagree with the Nevada Supreme Court about these trial management concerns. And so I think it was unreasonable, and that's not a proper application. So you're referring now to Kayer? I think that's how it's pronounced out of the Supreme Court. Kayer and the Bedreau case I think is the other one, too, that the more recent Supreme Court decisions that say you can't just do a de novo review of the record and then say I think it's objectively unreasonable. You have to actually engage in analysis to determine that no reasonable judge could have come to the same conclusion. So without those reasons, I'd ask the court to reverse. Okay. Thank you, counsel. Thank you to both counsel for your fine arguments this morning, and the matter is submitted at this time.
judges: McKEOWN, PAEZ, Sessions